# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

DEBORAH DOEL-HAMMOND, Ed.D.,

      Plaintiff,

v.

ALLIANCE FOR SUSTAINABLE ENERGY, LLC, a Delaware limited liability corporation,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Deborah Doel-Hammond, Ed.D. ("Plaintiff" or "Dr. Doel-Hammond"), by and through her undersigned counsel, Clayton E. Wire and Emily R. Fiscus of Ogborn Mihm, LLP, submits this Complaint and Jury Demand against Defendant Alliance for Sustainable Energy, LLC ("Alliance"), as follows:

## <u>INTRODUCTION</u>

1. In this employment action, Plaintiff Deborah Doel-Hammond, Ed.D., brings claims against her former employer, Defendant Alliance for Sustainable Energy, LLC, for sex discrimination; sex-plus-age discrimination; age discrimination; retaliation for engaging in protected activity in opposition to discrimination on the basis of, *inter alia*, sex; breach of implied contract; promissory estoppel; and wrongful discharge in violation of public policy.  Dr. Doel-Hammond reserves her claim for retaliation in violation of the National

Defense Authorization Act ("NDAA") for when that claim becomes ripe to bring with this Court.[1]

2. Alliance hired Dr. Doel-Hammond as its Chief Human Resources Officer ("CHRO") on June 1, 2018, to lead its Human Resources ("HR") Department.

3. During her employment with Alliance, Dr. Doel-Hammond engaged in protected opposition to Alliance's discriminatory, retaliatory, and unlawful conduct, that she reasonably believed violated Title VII of the Civil Rights Act of 1964 and Colorado's Anti-Discrimination Act, both by opposing what she believed was unlawful conduct, and by internally reporting to Alliance what she believed were violations of such statutes.

4. Dr. Doel-Hammond also engaged in protected reporting of what she reasonably believed to be Alliance's gross mismanagement or abuse of authority relating to its federal contract with the U.S. Department of Energy ("DOE"), a substantial and specific danger to Alliance's employees and the public's health or safety, and unfair competition for government contracts, as well as Alliance's violations of other federal, state, and administrative laws, rules, and regulations.

5. Dr. Doel-Hammond stepped beyond her role as CHRO in her participation as an interviewee, in her opposition to unlawful discrimination and retaliation, and in her reporting of Alliance's violation of its federal contract.

6. Dr. Doel-Hammond reasonably relied on the Laboratory-level Procedures for the National Renewable Energy Laboratory ("NREL") (the DOE facility for which Alliance was responsible), including PROC 500-13 "Employee Relations Reporting and Investigation"

---

[1] Dr. Doel-Hammond has alleged the claim herein as "Reserved" to give Defendant and the Court notice of such claim and will amend the Complaint and Jury Demand upon exhaustion of the U.S. Department of Energy Office of Inspector General's ("OIG") administrative process pursuant to 41 USC § 4712(c)(2).

and PROC 500-14 "Corrective and Disciplinary Actions," as part of the terms and conditions of her employment with Alliance.

7. Dr. Doel-Hammond's reporting of unlawful conduct came to a head in the spring and early summer of 2019.

8. On July 15, 2019, Alliance retaliated and discriminated against Dr. Doel-Hammond when it terminated her employment, shortly after she had engaged in protected conduct.

9. Alliance terminated Dr. Doel-Hammond without following Laboratory-level Procedures and Laboratory-level Policies, including NREL PROC 500-13 or PROC 500-14, that describe how Alliance as a Management and Operations contractor to the DOE will carry out its obligations at NREL.

10. By terminating Dr. Doel-Hammond, Alliance (a) engaged in unlawful discrimination and retaliation under Title VII, CADA, and the ADEA; (b) engaged in unlawful retaliation under the National Defense Authorization Act ("NDAA"); (c) breached its promises and implied contractual obligations; and (d) violated Colorado public policy.

## JURISDICTION AND VENUE

11. This action arises under the laws of the United States of America and the State of Colorado.

12. This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§ 451 and 1331.

13. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*

14. This action is authorized and instituted pursuant to the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-402, *et seq.*

15. This action is further authorized by and instituted pursuant to the common law of the State of Colorado.

16. Dr. Doel-Hammond also possesses retaliation claims in violation of the National Defense Authorization Act of 2013, 41 U.S.C. § 4712.  When such claim(s) become ripe, Dr. Doel-Hammond will amend this Complaint and Jury Demand (hereinafter, the "this Complaint"), and this Court will have jurisdiction over the subject matter pursuant 28 U.S.C. § 1331 and 41 U.S.C. § 4712(c)(2).

17. In addition, this Court has supplemental jurisdiction over Dr. Doel-Hammond's claims based on Colorado state law under 28 U.S.C. § 1367, because such claims form part of the same case or controversy as those claims over which the Court has original jurisdiction.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3), as all of the events giving rise to the claims asserted herein occurred in the District of Colorado of the United States of America.

19. All procedural prerequisites for the filing of this suit have been met.  Dr. Doel-Hammond timely filed a Charge of Discrimination and Amended Charge of Discrimination alleging age and sex discrimination, and retaliation for engaging in protected activity, against Alliance, with the Colorado Civil Rights Division ("CCRD").

20. The Charge of Discrimination was dual-filed with the United States Equal Employment Opportunity Commission ("EEOC").

21. On September 21, 2020, the CCRD issued Dr. Doel-Hammond a Notice of Right to Sue. **Exhibit A**.  Dr. Doel-Hammond has filed this Complaint within 90 days of receiving such notice.

22. On October 14, 2020, the EEOC issued Dr. Doel-Hammond a Notice of Right to Sue. **Exhibit B**. Dr. Doel-Hammond has filed this Complaint within 90 days of receiving such notice.

<u>**PARTIES**</u>

23. Plaintiff Deborah Doel-Hammond, Ed.D. is a 58-year-old woman, who has been a resident of the State of Colorado at all material times during the events described in this Complaint, and who now resides in the State of New Mexico.

24. Defendant Alliance for Sustainable Energy, LLC, is a Delaware limited liability corporation with its principal office located at National Renewable Energy Laboratory, 15013 Denver West Parkway, Golden, Colorado 80401.

25. Alliance manages and operates the National Renewable Energy Laboratory ("NREL"), a laboratory working to transform energy through research, development, commercialization, and deployment of renewable energy and energy efficient technologies, located at 15013 Denver West Parkway, Golden, Colorado 80401.

26. NREL is a national laboratory of the United States Department of Energy ("DOE"), Office of Energy Efficiency and Renewable Energy, operated by Alliance for Sustainable Energy, LLC, pursuant to a Management and Operating Contract between Alliance and the DOE.

27. Alliance employed Dr. Doel-Hammond within the State of Colorado and the United States District for the District of Colorado at all material times during the events described herein.

28. During the events described in this Complaint giving rise to this action, Dr. Doel-Hammond was an "employee" of Alliance within the meaning of 42 U.S.C. § 2000e(f), and Alliance was an "employer" within the meaning of 42 U.S.C. § 2000e(b).

## **GENERAL ALLEGATIONS**

### *Alliance Recruits and Hires Dr. Doel-Hammond as Chief Human Resources Officer*

29. Dr. Doel-Hammond obtained her Bachelor of Arts in Organization Management with Communication Concentration from Northwest University, where she graduated magna cum laude; her Master of Arts in Organization Management with Organizational Development Focus from Fielding Graduate University; and finally, her Doctorate from Pepperdine University in Organizational Leadership.

30. Since her early career, Dr. Doel-Hammond has worked in highly regulated government environments.  She worked in a human resources capacity in a federal contractor environment for eleven (11) years prior to employment with Alliance, with nine (9) of those years in a laboratory environment.  Dr. Doel-Hammond had four (4) years of responsibility as the top HR leader in a federal contractor laboratory environment and was responsible for HR procedures and policies.

31. Due to Dr. Doel-Hammond's nine (9) years of experience in HR at world-class laboratories and many years of experience with federal contractors, as well as decades of expertise, Alliance heavily recruited Dr. Doel-Hammond to work as its Chief Human Resources Officer ("CHRO").

32. Alliance sent a written offer to Dr. Doel-Hammond for the position as its CHRO on May 15, 2018.

33. Dr. Doel-Hammond accepted the position and began her first day of employment with Alliance on June 1, 2018.

34. After Dr. Doel-Hammond started employment at Alliance, she was told by Martin Keller, Alliance's President and Laboratory Director, that while Dr. Doel-Hammond's title was

Chief Human Resources Officer, she was <u>not</u> an officer of Alliance; rather, as CHRO, Dr. Doel-Hammond occupied only a management role.

35. All other employees in positions at Alliance with the word "officer" in the title, were officers of the company, not merely managers.  The role of CHRO was the only exception.

36. Upon information and belief, the role of CHRO at Alliance was typically filled by a female.

37. At the time of Dr. Doel-Hammond's hiring, and throughout her employment, Alliance's Senior Leadership demographics were such that only three positions, or approximately 19% of the Senior Leadership, were female – the Associate Laboratory Director, Facilities and Operations, COO, and CHRO positions.

38. Today, Alliance's demographic are such that only two positions, or approximately 13% of the Senior Leadership, are female.  *See* www.nrel.gov/about/diversity.html (last visited December 21, 2020).

***Alliance Works Under NREL's Management and Operating Contract with Full Accountability to the U.S. Department of Energy***

39. Alliance is a Joint Venture, formed by two research institutes, Battelle and MRIGlobal, for the purpose of obtaining and performing the NREL Management and Operating ("M&O") contract.

40. As an M&O Contractor for NREL, Alliance is fully accountable to the U.S. DOE Office of Energy Efficiency and Renewable Energy ("EERE") for NREL's performance.

41. Alliance is a federal government contractor.

42. On information and belief, based on Dr. Doel-Hammond's experience and knowledge of federal contractor requirements, as an M&O Contractor, Alliance is required to maintain and adhere to sufficient Laboratory-level Procedures and Policies in relation to, *inter alia*, the investigation, discipline, and termination of employees.

43. During Dr. Doel-Hammond's employment, Alliance was led by its President and Laboratory Director Dr. Martin Keller.

44. Alliance is governed by a Board of Directors consisting of five executives each from MRIGlobal and Battelle, as well as five other individuals from five universities.

45. On information and belief, the officers of Alliance (including, but not limited to, Dr. Martin Keller and Ms. Bobi Garrett) participated in Board of Directors meetings.

46. Alliance provides Management and Operations services to the DOE at NREL under the Alliance Prime Contract No. DE-AC36-08GO28308. *See* Prime Contract and Modifications, *available at* https://www.energy.gov/eere/downloads/request-proposals-rfp-number-de-rp36-07go97036-alliance-prime-contract-no-de-ac36 (last visited December 21, 2020).

47. NREL is a Federally Funded Research and Development Center (FFRDC) established in accordance with the Federal Acquisition Regulation (FAR) Part 35 and operated under the Alliance M&O Contract, as defined in FAR Subpart 17.6 and DOE Acquisition Regulation (DEAR) 917.6.

48. "The Contract, first awarded in 2008, was non-competitively extended on January 18, 2017 until September 30, 2023." *See* Prime Contract at Part I, Sect. C.1.

49. Among other requirements in its federal contract, Alliance "must ensure that the public's interest is always placed above its corporate interest, and potential or actual organizational conflicts of interest are promptly identified, avoided and/or mitigated." *Id.* at C.3.

50. Further, Alliance "shall manage and operate all NREL installations … effectively and efficiently, to ensure the longterm availability and protection of these installations and the federal investment, and in compliance with applicable laws, regulations, and directives,"

and "shall ensure the health and safety of staff and the public, and protect the environment." *Id.* at C.4.

51. Generally, Alliance also operates and has authority over all government-owned buildings at all NREL campuses or facilities and is responsible for the management and maintenance of such facilities to ensure the NREL mission is accomplished. *See id.* at C.4(d).

### *Dr. Martin Keller Hired Dr. Doel-Hammond to Revamp What Dr. Keller Described as Alliance's "Unsatisfactory" Human Resources Department*

52. In approximately July 2018, Dr. Keller met with Dr. Doel-Hammond to discuss much-needed changes within Alliance.

53. Dr. Keller characterized Alliance's HR department at that time as "unsatisfactory" and stated broad changes were necessary, not just in HR, but in many other departments at Alliance.

54. The meeting concluded with Dr. Keller directing Dr. Doel-Hammond to modernize, update, and bring into compliance, Alliance's HR department.

### *Dr. Doel-Hammond Urges Adherence to Duties and Obligations After a Group of Alliance Employees Report Discrimination to Dr. Keller and Dr. Peter Green*

55. Dr. Doel-Hammond continuously advised Alliance on the inadequacies of its EEO compliance and that it was required to abide by anti-discrimination laws through actions including, but not limited to the following:

　　a. Met with Alliance's President and COO on multiple occasions regarding deficiencies in Alliance's EEO compliance;

　　b. Advised Alliance's President that it was failing to adhere to OFCCP anti-discrimination rules in effect since 2015; and

　　c. Met with Alliance's General Counsel on multiple occasions regarding ███████ ████████████████████████████████████.

9

56. Dr. Doel-Hammond had a reasonable, good faith belief that the inadequacies in Alliance's EEO compliance and failures to abide by anti-discrimination laws were unlawful, or would be unlawful if not corrected.

57. Around February 2019, Dr. Keller informed Dr. Doel-Hammond that a group of Alliance employees had come to him and Dr. Peter Green (Alliance's Senior Vice President and Deputy Laboratory Director) and confidentially reported discrimination and harassment at Alliance.

58. Dr. Doel-Hammond observed Dr. Keller was visibly distressed and troubled when he came to her.  He spoke with anguish in his voice, furrowed his brow, rubbed his face, and spoke in a hushed voice.

59. In response to Dr. Doel-Hammond's questions, Dr. Keller clarified that the group of employees had given "many specific examples of discrimination" at Alliance and the NREL facility, some of which Dr. Keller characterized as "heartbreaking."

60. Dr. Keller stated that he believed the reports and examples of discrimination and harassment reported to him by the group of Alliance employees were true.

61. Dr. Keller went on to say that based on his knowledge of behaviors and personalities of particular managers, he believed that discrimination at Alliance was "real" and "systemic."

62. Dr. Keller further stated he had concerns of systemic discrimination not only in Dr. Bill Tumas's directorate, but also in Dr. Adam Brattis's and Dr. Bill Farris's directorates.

63. Dr. Keller gave Dr. Doel-Hammond the generic list of recommendations the employees provided to him to reduce discrimination at Alliance.

64. Pursuant to applicable requirements, including, but not limited to, NREL Laboratory-level Procedures and Policies, all management personnel at Alliance, including Dr. Keller, had a

duty to report discriminatory, harassing, and retaliatory conduct of which they became aware.

65. Dr. Doel-Hammond informed Dr. Keller he had a duty to report, and Alliance had an obligation to investigate, all instances of alleged unlawful discrimination and harassment, and to take appropriate action to prevent such conduct.

66. She told Dr. Keller that Alliance was required by federal and state laws to take action to remedy any discrimination on the basis of, *inter alia*, disability, age, race, sex, color, religion, or national origin.

67. Dr. Doel-Hammond recommended that Alliance involve Ms. Bobi Garrett (Alliance's Chief Operating Officer) based on her oversight role.

68. Dr. Keller forbade Dr. Doel-Hammond from reporting the meeting and allegations of discrimination to Ms. Garrett.

69. He further forbade Dr. Doel-Hammond from discussing her awareness of the meeting with Dr. Green.

70. Dr. Doel-Hammond told Dr. Keller that she disagreed with his position and that failing to investigate the discrimination, harassment, and retaliation reported to him, would violate federal and state civil rights statutes and potentially expose Alliance to future liability.

71. Dr. Doel-Hammond requested the specifics of the allegations and the identities of the complainants so she could investigate and take action to remedy the reported discrimination, as required by NREL Laboratory-level Procedures and Policies.

72. Dr. Keller refused to provide the specifics of the allegations or the identities of the complainants to Dr. Doel-Hammond, so she recommended that he at least advise Alliance's General Counsel, Mr. Steve Silbergleid.

73. However, Dr. Keller refused to allow Dr. Doel-Hammond to inform other Alliance officers, or to allow the HR department or the Office of General Counsel to investigate the discrimination the employees reported to him.

74. Dr. Doel-Hammond followed up for a second time with Dr. Keller in approximately March 2019, and insisted that he report to the Office of General Counsel what he had learned from the group of employees, so that a proper investigation could occur, in order to prevent potentially unlawful ongoing, systemic, or isolated discrimination.

75. Given his position as President and Laboratory Director, Dr. Doel-Hammond again informed Dr. Keller that pursuant to NREL Laboratory-level Procedures and Policies, he had a duty to report, and that Alliance had an obligation to investigate and mitigate the discrimination since he and Dr. Green, and thus, Alliance, had knowledge of such allegations.

76. Dr. Keller continued to insist on secrecy.

77. In response, Dr. Doel-Hammond suggested Dr. Keller at least consider a climate survey for the three directorates of concern, and possibly more broadly throughout Alliance, but Dr. Keller would not commit to action.

78. At a later date, in approximately March 2019, Dr. Doel-Hammond reported to Mr. Silbergleid ███████████████████████████████████████.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████.

79. Mr. Silbergleid ███████████████████████████████████

████████

80. For a third time, in approximately April 2019, after learning that the CCRD found probable cause against Alliance in a retaliation matter based on reports of sex discrimination, Dr. Doel-Hammond again attempted to persuade Dr. Keller to comply with his duty to report and Alliance's obligation to investigate, to address any allegations of discrimination or harassment.

81. Dr. Doel-Hammond informed Dr. Keller that he could not simply bury his head in the sand regarding the reports of discrimination made to him and Dr. Green, and that Alliance needed to take steps to address what he had characterized as "heartbreaking" examples of discrimination taking place at NREL.

82. Dr. Keller began to minimize any knowledge that such reports were ever made to him in the first place.

83. Dr. Keller grew terse and short with Dr. Doel-Hammond, and cut the conversation off short.

84. Around that same time, as Mr. Silbergleid and Dr. Doel-Hammond ███████████████ ████████████████████████████████████████████████████████████, Dr. Doel-Hammond reported to Mr. Silbergleid ███████████████████████████ ██████████████████████████████

85. Mr. Silbergleid ███████████████████████████████████████████ ████████████      Mr. Silbergleid ████████████████████████████.



86. By the third time Dr. Doel-Hammond discussed this issue with Dr. Keller, she experienced tension and a marked negative shift in their working relationship.

*Alliance Discriminates Against Women on the Basis of Sex*

87. In late March 2019, Dr. Doel-Hammond became aware that the CCRD found "cause" to support retaliation based on a complaint of sex discrimination and retaliation brought by a former female employee.

88. Dr. Doel-Hammond attended a CCRD conciliation regarding this matter on April 1, 2019.

89. Around that same time, a local news channel reported on the female employee's discrimination and retaliation charges against Alliance, and separately, reported three additional charges brought against Alliance by former employees on the basis of disability discrimination.

90. Despite Alliance being involved in conciliation through the CCRD due to allegations of retaliation and sex discrimination, and despite Dr. Doel-Hammond's repeated reports of her concerns, Dr. Keller continued to refuse to allow Dr. Doel-Hammond to take adequate steps to investigate and ensure compliance with anti-discrimination requirements at Alliance.

*Alliance Discriminates and Retaliates against Dr. Elisabetta Arca Based on Her Sex and Because of Her Protected Reporting*

91. Upon information and belief, on March 29, 2019, Dr. Green notified Dr. Keller that a postdoc employee made an allegation of discrimination that day.

92. That night, after business hours on a Friday, Dr. Keller called Dr. Doel-Hammond.  Dr. Doel-Hammond's husband answered the phone, and was unable to determine the identity of the caller based on the level of the caller's excitement.  Dr. Doel-Hammond's husband woke her for the call.

93. Dr. Keller immediately expressed anger toward Dr. Doel-Hammond, using a parental tone, scolding her, and raising his voice.

94. Dr. Keller demanded to know why Dr. Doel-Hammond had not already alerted him to an allegation of discrimination that day.

95. Dr. Doel-Hammond was reduced to despair by Dr. Keller's accusations that she knew something but failed to report to him.  In fact, at that moment, Dr. Doel-Hammond had no idea to what Dr. Keller was referring.

96. Dr. Doel-Hammond promised to contact the HR business partners right away regarding any recent report of discrimination, and get back to Dr. Keller with the facts in approximately 20 minutes.

97. Dr. Keller firmly agreed with this proposed follow-up by Dr. Doel-Hammond.

98. After gathering information, Dr. Doel-Hammond contacted Dr. Keller and explained that she just learned that the postdoc, Dr. Elisabetta Arca, had made reports of discrimination not that day, but month(s) earlier.  Dr. Doel-Hammond informed Dr. Keller she just learned that what had happened on March 29, 2019, was that Ms. Donna Wachter (Alliance HR, subordinate to Dr. Doel-Hammond) acted with Dr. Arca's management chain to evict Dr. Arca from campus.

99. Dr. Keller stated that he was not surprised.

100.  Ms. Wachter had a close personal relationship with the DOE Golden Field Office Director, Derek Passarelli.

101.  On information and belief, based on Ms. Wachter's and others' statements to Dr. Doel-Hammond, Mr. Passarelli and Ms. Wachter had gone to high school together; then Ms. Wachter was subsequently employed by Mr. Passarelli; and the two remained close friends.

102.  As Dr. Doel-Hammond found out following her call with Dr. Keller, on March 29, 2019, Ms. Wachter disciplined a female researcher at Alliance, Dr. Elisabetta Arca, by evicting her from campus.

103.  Ms. Wachter evicted Dr. Arca without following NREL's Laboratory-level Procedures, without HR leadership approval, and without Dr. Doel-Hammond's knowledge or approval as CHRO.

104.  Dr. Arca told Dr. Doel-Hammond and others, that Dr. Arca felt the actions taken against her were a consequence of her reporting concerns regarding gender-based harassment, *i.e.*, retaliation in violation of state and federal law.

105.  Dr. Arca further stated and wrote that the actions taken against her prohibiting her from working on campus were in retaliation for her reports.

106.  Dr. Arca previously made complaints regarding gender discrimination, harassment, hostile work environment, and safety concerns before her campus eviction.

### *Dr. Doel-Hammond Opposes the Discrimination and Retaliation Dr. Arca Suffered*

107.  After becoming aware of the eviction of Dr. Arca, Dr. Doel-Hammond and Mr. Silbergleid met with Dr. Arca's management chain to ███████████████████████

█████████

108.  The management chain, including Dr. Bill Tumas, described to Dr. Doel-Hammond and Mr. Silbergleid that ████████████████████████████████

███████████████████████████████████████████████████

██████████████

109.  Dr. Arca's management chain, including Dr. Tumas and Dr. Nancy Haegel, never believed the truth of Dr. Arca's reports, and instead, simply viewed Dr. Arca's continued reporting as her being a "troublemaker."

110.  Dr. Arca worked in Dr. Tumas' directorate, one of the directorates that Dr. Keller had previously stated to Dr. Doel-Hammond experienced "real" and "systemic" discrimination (which he would not allow Dr. Doel-Hammond to investigate or evaluate).

111.  Dr. Arca's management chain was unable to provide a single negative write-up or report to justify the disciplinary action; to the contrary, Dr. Arca had only positive performance reviews and a recent positive reference letter written by her current manager.

112.  Dr. Doel-Hammond reported to Mr. Silbergleid ███████████████████ ███████████████████████████

113.  Dr. Doel-Hammond and Mr. Silbergleid discussed ████████████████████ ██████████████████████.

114.  Dr. Doel-Hammond worked with Alliance's General Counsel to return Dr. Arca to campus, ████████████████████████████ ███████████████████████.

115.  Mr. Silbergleid vocalized ████████████████████

116.  Dr. Doel-Hammond and Mr. Silbergleid spoke with Dr. Keller, ██████████████ ██████████████████

117.  Dr. Doel-Hammond and Mr. Silbergleid reported ████████████████████ ████████████████████████████████ ████████████████

118.  They reported to Dr. Keller 

119.  Alliance hired Investigations Law Group, a third-party investigator, to investigate the

facts surrounding Dr. Arca's eviction.

120.  An important purpose of this investigation was to enable the Office of General Counsel to



121.  In April 2019, Alliance's Office of General Counsel contacted Dr. Doel-Hammond

122.  Dr. Doel-Hammond                participated in the interview in approximately late April

or early May 2019.

123.  During the interview, Dr. Doel-Hammond explained she had no advance knowledge of

the eviction, and described how she became aware of the events in the hours and days

following the eviction.

124.  Dr. Doel-Hammond expressly stated to the investigator that she believed Alliance

(through the actions of Ms. Wachter and Dr. Arca's management chain) had retaliated

against Dr. Arca by evicting her from campus due to, *inter alia*, Dr. Arca's prior

complaints that included allegations of sex discrimination, safety issues, and gender-based

harassment – whether or not Dr. Arca's complaints were ultimately substantiated.

125.  Although Dr. Doel-Hammond and Mr. Silbergleid were the points of contact for this investigation, Dr. Doel-Hammond never received a written report or invitation to debrief as to the results.

126.  Mr. Silbergleid told Dr. Doel-Hammond ███████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████.  On information and belief, Dr. Keller received the written report produced by Investigations Law Group regarding the investigation of Dr. Arca's eviction, including the fact of Dr. Doel-Hammond's participation in the interview, as well as her statement that Alliance had retaliated against Dr. Arca for her protected reporting.

127.  On information and belief, Dr. Keller also received a verbal report or debriefing regarding the facts and results of Investigations Law Group's investigation of Dr. Arca's eviction, including the fact of Dr. Doel-Hammond's participation in the interview, as well as her statement that Alliance had retaliated against Dr. Arca for her protected reporting.

128.  Following Dr. Arca's eviction and return to campus, Dr. Doel-Hammond held three listening sessions with up to eighty (80) concerned employees.

129.  During these meetings, where Dr. Arca was present, an employee voiced concern that employees would, like Dr. Arca, be evicted if they complained about discrimination, harassment, or safety concerns.  Other employees nodded or voiced agreement.

130.  The largest group of employees in the final listening session proclaimed the meeting to be an encouraging first step to open dialogue, and requested the ability to continue to meet with Dr. Doel-Hammond on a recurring basis to address their concerns, which included fears of reprisal for reporting concerns of discrimination.

131.  Dr. Doel-Hammond reported to Dr. Keller that the employees asked if they would be

evicted if they reported concerns of discrimination, harassment, or safety concerns.  Dr.

Keller only responded by vocalizing a sound that Dr. Doel-Hammond interpreted as

frustration and exasperation.

***Dr. Doel-Hammond Engages in Protected Activity by Initiating the Termination of Ms. Wachter due to Ms. Wachter's Violations of Federal and State Laws***

132.  In response to what Dr. Doel-Hammond believed was discrimination and retaliation

against Dr. Arca, as well as other improper conduct, Dr. Doel-Hammond believed

discipline of Ms. Wachter was necessary.

133.  The next day, Dr. Doel-Hammond sought consult from Ms. Mary Ann Potter (HR for HR

at Alliance).  Ms. Potter had knowledge of Dr. Doel-Hammond's previously communicated

expectations to Ms. Wachter.

134.  Ms. Potter told Dr. Doel-Hammond that there was little alternative but to initiate the

termination of Ms. Wachter.

135.  Dr. Doel-Hammond ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████

136.  Dr. Doel-Hammond engaged in protected activity to oppose and remedy the apparent

retaliation and discrimination against Dr. Arca by Ms. Wachter and Alliance, by beginning

the process of disciplining Ms. Wachter.

***The Leadership Review Board Terminates Ms. Wachter*** ████████████████████
████████████████████████████████

137.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████, Dr.

Doel-Hammond participated as a "hiring manager" in a Leadership Review Board that ultimately determined that Ms. Wachter should be terminated.

138. ████████████████████████████████████████████id, Ms. Bobi Garrett participated as an independent party in this Leadership Review Board.

139.  At the time that Ms. Garrett agreed to serve as the independent party, Dr. Keller had delegated to her his operations responsibilities and authority, as he was on vacation skiing in Italy.

140.  Mr. Silbergleid and Dr. John Stolpa (Deputy General Counsel) also participated in Ms. Wachter's Leadership Review Board.

141.  Throughout the Leadership Review Board, Dr. Doel-Hammond held herself to the highest degree of integrity and accountability, by: a) ████████████████████████ ████████████████████████████; b) involving Ms. Garrett (who was exercising the responsibilities of Dr. Keller at the time) as an independent party; c) involving and taking direction from Alliance's HR for HR; and d) removing herself from a direct decision-making role.

142.  At no point in time did Mr. Silbergleid, Dr. Stolpa, ██████████████████████ ████████████████████████████████████████████ ██████████

143. ████████████████████████████████████████████████████████ ████████████████████████

144.  The Leadership Review Board participants also offered additional reasons for inclusion in the termination decision.

145.  At the conclusion of the procedure, the Leadership Review Board elected to terminate Ms. Wachter on April 2, 2019, consistent with Dr. Doel-Hammond's recommendation.

146.  Dr. Doel-Hammond's recommendation to terminate Ms. Wachter constituted protected activity as opposition to Ms. Wachter's unlawful retaliation and discrimination against Dr. Arca.

147.  Around the time of the Leadership Review Board, Dr. Doel-Hammond participated in a conversation, wherein Ms. Garrett raised the question "Do we need to tell Derek [Passarelli]?"

148.  On information and belief, Ms. Garrett notified Mr. Passarelli in advance of Ms. Wachter's termination, so as to avoid potential negative impacts to Alliance.

149.  On information and belief, Ms. Garrett and Mr. Silbergleid ██████████████

██████████████████████████████

██████████████████████████████

██████████████

*Dr. Doel-Hammond Observes and Reports an Improper Occupancy Issue Between the DOE and Alliance, which Violates the M&O Federal Contract*

150.  In early 2019, Dr. Doel-Hammond became aware of the overcrowded laboratories and office spaces at the NREL facilities, which she believed contributed to unsafe working conditions and public safety issues at NREL.

151.  Dr. Doel-Hammond was aware of safety and morale complaints relating to overcrowded labs being raised through management chains, which were regularly and frequently discussed at Safety Meetings and Executive Meetings between February and June 2019.

152.  Under its Federal Contract, Alliance was responsible for the management and operation of NREL facilities, and exercised authority over the entire NREL South Table Mountain

Campus, and other locations, for its own research and collaborations in fulfillment of the NREL mission.

153.  Since before Dr. Doel-Hammond started at Alliance, DOE staff who were not necessary for the oversight of the M&O Contract occupied office space at the NREL South Table Mountain Campus.

154.  Approximately 130 DOE Golden Field Office staff occupied the 2nd floor, C wing of the Research Support Facility on the South Table Mountain Campus, after leaving a previously leased facility.  Approximately 10-20 of these individuals supported the M&O contract for Alliance.  The remaining personnel had no involvement with the M&O contract.

155.  The DOE's occupancy of office space at the NREL South Table Mountain Campus contributed to and/or caused overcrowding in the remainder of the facilities – having overall adverse impact on the mission of NREL.

156.  This overcrowding resulted in unsafe work conditions for Alliance employees and NREL contractors and partners, as well as the public, and had a negative impact on employee morale.

157.  The overcrowding of the NREL South Table Mountain Campus, including safety and morale concerns, were discussed in executive meetings and were brought to the attention of Alliance's Board of Directors.

***Dr. Doel-Hammond Became Concerned that the Extraneous DOE Staff's Occupancy of NREL Office Space was Improper and Violated the Federal Contract and Regulations***

158.  While the overcrowding and safety issues were well known, Dr. Doel-Hammond's concern grew immensely in or about April 2019 when Owen Barwell (Alliance's Chief Financial Officer), disclosed to her that extraneous DOE employees were irregularly

occupying office space at NREL, adversely affecting NREL's mission, and DOE was financially benefitting.

159.  Mr. Barwell informed Dr. Doel-Hammond that a few years prior, the DOE had stopped leasing outside office space and moved approximately 130 DOE personnel to the NREL South Table Mountain Campus, which included 100+ DOE staff who were not necessary for management of or permitted by the M&O Contract, and thus, was inappropriate.

160.  Mr. Barwell told Dr. Doel-Hammond that the DOE occupying the space was inappropriate, and that only about a dozen DOE staff should be on the NREL campus because only about a dozen DOE employees had responsibilities for the oversight of the M&O contract.  Mr. Barwell stated he believed DOE was taking advantage of Alliance and was financially benefitting.

161.  Dr. Doel-Hammond recognized that the irregular site occupancy by the DOE involved the presence of extraneous DOE staff on the NREL site having no contract or oversight responsibilities.

162.  Dr. Doel-Hammond believed that overcrowding at the South Table Mountain Campus site negatively impacted employee and public safety, employee morale, and potentially compromised NREL's mission.

163.  Dr. Doel-Hammond also believed that the irregular occupancy relationship between the DOE and Alliance was improper, unlawful, violated the federal contract between Alliance and DOE, and created a conflict of interest.

164.  Dr. Doel-Hammond believed that Alliance, as a federal contractor, was required to maintain proper distance and boundaries within its relationship with the DOE to avoid even

the appearance of impropriety, favoritism in receipt of contracts, and fairness to consumers and business practices.

165.  Dr. Doel-Hammond believed that the DOE improperly benefitted financially from housing 100+ extraneous employees who had no contractual responsibilities, while Alliance, Battelle, and MRIGlobal stood to benefit by receiving preferential treatment when competing for DOE contracts due to the favorable treatment Alliance gave to the DOE.

166.  Dr. Doel-Hammond believed the improper occupancy arrangement created a conflict of interest because it incentivized the DOE to retain Alliance, and created an incentive to act improperly in regard to contracting with Alliance.

167.  Dr. Doel-Hammond reasonably believed that the DOE's inappropriate occupancy of office space violated the Prime Contract between Alliance and the DOE, and FAR.

168.  Dr. Doel-Hammond believed that, because the DOE did not have a proper or legal agreement for extraneous personnel to access the space, the DOE's commandeering of the space operated by Alliance under the Prime Contract violated the Prime Contract, including its requirement to dedicate NREL resources to fulfillment of the NREL mission.

169.  She was concerned that such an improper arrangement was a gross mismanagement of the Federal Contract by Alliance, with the collusion of the DOE.

170.  She was also concerned that such an improper relationship between the DOE and Alliance, whereby the DOE was given space on NREL's premises to occupy without compliance with the Prime Contract, was an arbitrary and capricious exercise of authority that was inconsistent with the purposes of the contract.

171.  Further, she was concerned that this arrangement violated not only the terms of the Federal Contract, but also the FAR, and gave Alliance an unfair and improper advantage in competition for and negotiation of the Federal Contract, since Alliance was providing the DOE and its staff with a significant benefit that another contractor would not (if they complied with the contract terms).

172.  On information and belief, this improper arrangement had been going on prior to 2017, and thus had an impact on the decision to extend Alliance's contract non-competitively.

173.  Mr. Passarelli, the Head of the Golden Field Office for the DOE, and Dr. Keller, appeared to mutually benefit from the improper occupancy relationship, which raised Dr. Doel-Hammond's level of concern.

### Dr. Doel-Hammond Reports Concerns Regarding the DOE's Improper Occupancy of Space Subject to Alliance's M&O Contract

174.  Near the end of May 2019, Dr. Doel-Hammond met with Alliance's then Chief Operating Officer and Deputy Laboratory Director, Ms. Garrett, and reported her concerns that the DOE's improper occupancy of the South Table Mountain Campus space may constitute kickbacks, unfair industry competition, and violations of Alliance's contract with the DOE.

175.  Dr. Doel-Hammond intentionally did not report to Ms. Garrett who reported concerns to Dr. Doel-Hammond because of her concerns of retaliation against the reporter.

176.  Dr. Doel-Hammond reported to Ms. Garrett her concerns that the adverse impact on employee health at NREL was causing a safety issue and undermining employee morale, which concerned her in her role as CHRO.

177.  During this meeting, Dr. Doel-Hammond asked Ms. Garrett about the nature of the occupancy arrangement with the DOE and whether it was true that there were irregularities

in the occupancy.  In response, Ms. Garrett confirmed that the extraneous DOE staff were occupying space and the arrangement was irregular.

178.  Dr. Doel-Hammond asked Ms. Garrett whether the occupancy arrangement was providing a financial benefit to the DOE. Ms. Garrett confirmed she believed that the DOE inappropriately benefitted financially from its occupation of an entire wing at NREL, because the DOE could direct designated funds elsewhere.

179.  Ms. Garrett indicated that the DOE's occupancy of space was inappropriate and was well-known among Alliance executives, but there were "political consequences" to anyone willing to confront what had become an increasingly complex dynamic, where everyone had grown reluctant to confront the DOE's commandeering of the space.

180.  Ms. Garrett agreed the situation was problematic, and that she, as an officer of the company, had knowledge of the situation.

181.  Dr. Doel-Hammond reported the following concerns to Ms. Garrett, that the improper occupancy:

    a.   Violated the Prime Contract;

    b.   Potentially constituted kickbacks, unfair industry competition, favoritism in receipt of federal contracts, or even an appearance of impropriety;

    c.   Created a conflict of interest; and

    d.   Caused adverse effect to Alliance employees' health, safety, and morale.

182.  Ms. Garrett informed Dr. Doel-Hammond that while Ms. Garrett believed the irregular occupancy should be addressed, **the last person who tried to shine light on the issue was terminated.**

183.  During the same meeting, Dr. Doel-Hammond presented Ms. Garrett with a potential
      solution, remaining steadfast that the occupancy issue was improper and compromised
      NREL's mission for a variety of reasons.  Dr. Doel-Hammond suggested Alliance take
      action to explore whether the extraneous DOE staff might again relocate outside the NREL
      campus to create office space for Alliance employees to accomplish NREL's mission at the
      South Table Mountain Campus Research Support Facility, facilitate lab expansion in lab
      buildings, reduce concerns for labor organizing over employee safety and morale issues,
      and, most importantly, put an end to the inappropriate relationship.

184.  Ms. Garrett agreed with Dr. Doel-Hammond's concerns, and that her proposed resolution
      would be appropriate.

185.  Ms. Garrett agreed to discuss the concerns raised by Dr. Doel -Hammond with Dr. Martin
      Keller, the President and Laboratory Director of Alliance.

186.  Subsequently, after speaking with Ms. Garrett, on or about May 30, 2019, Dr. Doel-
      Hammond took her concerns directly to Dr. Keller.

187.  Dr. Doel-Hammond reported to Dr. Keller that she believed that the DOE's occupancy of
      NREL space was potentially inappropriate and unlawful; that it resulted in kickbacks;
      created a lack of transparency in governmental contracting; and created ethical concerns.

188.  Dr. Doel-Hammond told Dr. Keller that she had been informed that the improper
      occupancy arrangement created a financial benefit to the DOE and that she was concerned
      that this may create a conflict of interest.

189.  Dr. Doel-Hammond told Dr. Keller that because the resulting overcrowding contributed
      to unsafe and crowded working conditions, employees may seek to unionize in an attempt
      to resolve the issues.

190. Dr. Doel-Hammond also made Dr. Keller aware that she had already reported similar concerns to Ms. Garrett, who planned to discuss the concerns with Dr. Keller.

191. Dr. Doel-Hammond suggested to Dr. Keller that, at the very least, Alliance should take action to explore whether extraneous DOE staff might relocate off campus to resolve the improper occupancy arrangement and mitigate potential employee organizing.

192. Despite Dr. Doel-Hammond's asserted concerns and reports of impropriety, Dr. Keller did nothing.

193. Dr. Doel-Hammond's reporting of the DOE's improper space occupation at NREL furthered the tension and strain that Dr. Doel-Hammond felt in her working relationship with Dr. Keller, increasing the cumulative effect from the tension that arose from her protected activity regarding discrimination and retaliation earlier that spring.

194. In late May 2019, before she was informed of any investigation, Dr. Doel-Hammond also met with Steve Silbergleid, General Counsel for Alliance, ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████

195. Dr. Doel-Hammond ███████████████████████████████████ ███████████████████████████████████████████████.

196. Dr. Doel-Hammond told Mr. Silbergleid ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████

***Dr. Keller Retaliates Against Dr. Doel-Hammond for Her Protected Activity Related to
Discrimination, Retaliation, and Reporting the DOE's Improper Space Occupancy***

197.  Dr. Keller announced an investigation during an executive team meeting on

approximately June 3, 2019, without disclosing the topic of investigation.

198.  On information and belief, unbeknownst to Dr. Doel-Hammond at the time, Dr. Keller

and others solicited Alliance HR personnel for "dirt" on Dr. Doel-Hammond to be used in

the investigation.

199.  Previously, during meetings with the DOE, following the termination of Ms. Wachter in

April 2019, Ms. Reesha Trznadel (DOE General Counsel and personal friend of Ms.

Wachter) repeatedly advocated for an investigation of Alliance's HR department, and

particularly, Dr. Doel-Hammond, after the termination of Ms. Wachter.

200.  Dr. Keller initially rebuffed such requests in April 2019, stating in meetings that the DOE

was retaliating against Dr. Doel-Hammond for the termination of Ms. Wachter.

201.  It was only **after Dr. Doel-Hammond reported her concerns regarding the DOE's**

**improper occupancy of NREL space** that Dr. Keller went ahead with an investigation of

Dr. Doel-Hammond.

202.  On June 7, 2019, Dr. Doel-Hammond arrived to be interviewed, and only mid-way

through her interview, did she discover that she was the subject of the investigation.

203.  The investigator was Ms. Jan Hensel.  Ms. Hensel represented herself to Dr. Doel-

Hammond as an independent investigator.

204.  NREL PROC 500-13 details the Laboratory-level Procedure that must be followed when

investigating an employee for complaints. **Exhibit C.**

205.  PROC 500-13 requires following certain steps, including, *inter alia*:

a.  HR business partner to consult with the Office of General Counsel and notify
appropriate management;

      b.  Interview witnesses;
      c.  Interview the accused;
      d.  Review employee records for both the complainant and the accused;
      e.  Inform the accused of the results of the investigation and the recommended action if the complaint is substantiated.
      f.  Provide the accused the opportunity to submit an oral or written statement on her behalf.

*Id.*

206.  In deviation of PROC 500-13, investigator Ms. Hensel interviewed Dr. Doel-Hammond, but did not provide Dr. Doel-Hammond the basis of the allegations against her or an opportunity to defend herself and be heard.  *See id.*

207.  During the interview, Ms. Hensel declined Dr. Doel-Hammond's offer to provide a case-log multiple times.

208.  Around the same time, Dr. Keller would neither speak to nor look at Dr. Doel-Hammond, as the cumulative tension continued to increase.

209.  On information and belief, after Alliance's interview of witness Jessica Pascual (Alliance's HR Director of People Operations), Ms. Pascual went to Ms. Garrett to report her perception of the investigation as an attack, rather than an interview.

210.  Ms. Pascual was upset.  Ms. Pascual reported to Ms. Garrett that she believed the proceeding was unjustified and unfair.

211.  On information and belief, Ms. Garrett stated that she too, was upset.

212.  Approximately one week after Dr. Doel-Hammond's interview in the investigation against her, she took a walk with Ms. Garrett.  Ms. Garrett told Dr. Doel-Hammond that Dr. Keller was an emotional and inexperienced President, and that if he had been more experienced, she believed he would <u>not</u> have instituted an investigation into Dr. Doel-Hammond.

213.  Dr. Keller tainted the investigation of Dr. Doel-Hammond, as he probed Alliance

employees, including Ms. Pascual, to provide negative information about Dr. Doel-

Hammond during the pendency of the investigation in violation of PROC 500-13's

requirement for confidentiality.  *See id.*

**After the June Board of Directors Meeting, Dr. Doel-Hammond Discusses Her Concerns With Board Member Mr. Marty Conger**

214.  On June 25, 2019, an Alliance Board of Directors meeting was held, at which Board

Members heard a special presentation about space shortage resulting in serious safety

concerns and employee morale issues.

215.  At this Board meeting, Dr. Doel-Hammond presented the "People Strategy," in which she

highlighted the need for "a safe, inclusive and innovative work environment," inclusive of

previously presented space shortages and resulting safety and morale challenges.

216.  At a dinner event after this Board meeting, Dr. Doel-Hammond spoke with Board

Member Mr. Marty Conger, who expressed that he was frustrated with the DOE's

occupancy of NREL space, believed this occupancy was negatively impacting employee

safety and morale, and that the DOE was taking advantage of Alliance.

217.  Dr. Doel-Hammond reported to Mr. Conger that (a) she was also frustrated with the

DOE's improper occupancy of space; (b) shared his concerns; (c) she had reported her

concerns to Ms. Garrett; and (d) Ms. Garrett informed her that the last person who tried to

address the issue had been fired.

**Alliance Terminates Dr. Doel-Hammond in Violation of NREL Laboratory-level Procedures, Including PROC 500-13 and PROC 500-14**

218.  Following her interview, Dr. Doel-Hammond heard nothing for several weeks, and took

previously approved leave in early July 2019.

219.  On July 15, 2019, the day that Dr. Doel-Hammond returned from her leave, Dr. Doel-Hammond met with Dr. Keller and General Counsel for MRIGlobal, Reachel Beichley. They informed Dr. Doel-Hammond ███████████████████████████████████ ████████████████████████████████████████████████████.

220.  Other than vague statements by Dr. Keller about ████████████████████ ████████████████████████████████████████████████ ████████████████████.

221.  Moreover, there was no acknowledgment by Alliance that, in terminating Ms. Wachter, Dr. Doel-Hammond ████████████████████████████████████████ ████████████and COO (who was exercising the responsibilities of the President).

222.  Dr. Doel-Hammond expressed ██████████████████████████████ ████████████████████████████ In response, Ms. Beichley paused, ████████ ████████████████████████████████████.

223.  In reality, Alliance's proffered reason for terminating Dr. Doel-Hammond was pretext for unlawful discrimination and retaliation.

224.  After Alliance terminated Dr. Doel-Hammond, it required her to communicate regarding severance and remaining issues with Alliance's attorney, Ms. Jan Hensel (who Dr. Doel-Hammond knew to be Alliance's purported independent investigator).

225.  Subsequent to the termination of Dr. Doel-Hammond, Alliance's justification for its decision to terminate Dr. Doel-Hammond has shifted over time, as reflected in communications from its attorney, Ms. Jan Hensel.

***Alliance's Investigation and Termination of Dr. Doel-Hammond was Contrary to the Obligations in Laboratory-level Procedures that Set the Terms and Conditions of Dr. Doel-Hammond's Employment***

226.  In deviation of PROC 500-13, Dr. Doel-Hammond was not provided with the results of the investigation against her or recommended action, nor was she afforded the opportunity to submit an oral or written statement on her behalf.  *See* **Exhibit C at Steps 7 and 8**.

227.  PROC 500-13 states that "NREL does not tolerate . . . intimidation, retaliatory behavior, harassment . . . or conduct that creates a hostile or unsafe environment." *Id.* PROC 500-13 also states "NREL prohibits reprisals and/or retaliation against a worker . . . assisting in an investigation." *Id.*  Alliance violated PROC 500-13 regarding Dr. Doel-Hammond when it retaliated against her, including by retaliating against her for engaging in protected activity to assist in the investigation of Dr. Arca's unlawful eviction.  *See id.*

228.  Further, in deviation of PROC 500-14, Alliance did <u>not</u> hold a Leadership Review Board to hear and decide the proposed discipline of Dr. Doel-Hammond. *See* **Exhibit D.**

229.  PROC 500-14, under the heading "Termination Review Board" provides that "[t]erminations are reviewed by members of the leadership team in conjunction with the cognizant line manager, the chief human resources office, and the general counsel to decide on a course of action." *Id.*

230.  PROC 500-14 also requires the line manager of the employee in question to "[c]onsult with the HR business partner for guidance and advice[,]" to "[p]repare information regarding corrective action and disciplinary actions in collaboration with the HR business partner[,]" and to "[c]ollaborat[e] with the HR business partner . . . if the performance documentation is in a written format." *Id.*

231.  PROC 500-14 provides that "[c]ollaboration with the chief human resources officer and general counsel is required when the proposed action is administrative leave, suspension, demotion, or termination." *Id*.

232.  However, Alliance did not adhere to any of these procedures required by NREL PROC 500-14 in its termination of Dr. Doel-Hammond.  *See id.*

233.  Dr. Doel-Hammond continued her employment, with the expectation that she would not be investigated or terminated unless NREL Laboratory-level Procedures and Policies, including PROC 500-13 and 500-14 were followed.

234.  All internal procedures and policies, including, but not limited to, NREL PROC 500-13 and 500-14, applied to all employees, unless the procedure or policy said otherwise.

235.  Dr. Doel-Hammond was the named owner of NREL's Laboratory-level Procedures and Policies for Human Resources, and was responsible for all such Procedures and Policies. Had there been another set of Procedures or Policies, Dr. Doel-Hammond would have been aware of their existence.

236.  Dr. Doel-Hammond's reliance on the Laboratory-level Procedures was reasonable, in light of, *inter alia*, DOE's requirement that its contractors, such as Alliance, adhere to its Laboratory-level Procedures, as well as Dr. Doel-Hammond's 9 years of experience in HR with other governmental contractors.

237.  Based on Dr. Doel-Hammond's conversations with Mr. Silberglied, and with her predecessor, Ms. Penny Burton, Dr. Doel-Hammond believed NREL's Laboratory-level Procedures and Policies constituted the terms and conditions of her employment with Alliance.

***Prior to Alliance's Termination of Her Employment, Dr. Doel-Hammond was an Exceptional Employee***

238.  Prior to her termination, Dr. Doel-Hammond met and exceeded expectations in her role.

239.  Dr. Keller conducted Dr. Doel-Hammond's FY18 Performance Review, and rated Dr. Doel-Hammond's performance as "exceeded expectation."

240.  Dr. Keller commented that the evaluation competencies were very important to him, and that one of Dr. Doel-Hammond's strong competencies was "Building Effective Teams (you are not afraid to change folks and remove people who are not living up to your expectation. This said, you are very supportive of your team and do a great job to give everybody the credit they deserve)".

241.  During her employment, Dr. Doel-Hammond never received verbal counseling or reprimand, nor did she ever receive any form of a write-up.

242.  Dr. Doel-Hammond's supervisors never alleged she was insubordinate, or that she missed work meetings or obligations.

243.  Prior to the retaliatory investigation of Dr. Doel-Hammond, Alliance never alleged Dr. Doel-Hammond engaged in unprofessional behavior or poor performance.

***Alliance Treated Dr. Doel-Hammond in a Harsher Manner than Similarly Situated Male Employees***

244.  Mr. Silbergleid and Dr. Stolpa, two male employees in the Office of General Counsel who also participated in and directed Ms. Wachter's termination, were not disciplined for their involvement in the termination of Ms. Wachter with the same severity that Dr. Doel-Hammond experienced.

245.  Dr. Stolpa admitted ████████████████████████████████████
████████████████████████████████████████████████████████

██████████████████████████████████████

██████████

246.  Not only was Dr. Stolpa not disciplined or terminated like Dr. Doel-Hammond, he was promoted twice: first, to Acting General Counsel (a promotion in status), and second, to Alliance's General Counsel (a promotion with which a salary increase is highly likely).

247.  On information and belief, after Dr. Doel-Hammond's termination, Ms. Garrett stated to Ms. Pascual that she had very mixed feelings about the termination of Dr. Doel-Hammond, and had experienced a hard time getting aligned with the decision to investigate Dr. Doel-Hammond.

***Alliance Has a History of Discriminating Against Employees on the Basis of Sex***

248.  Dr. Doel-Hammond was aware that Alliance had a pattern of discrimination against female employees.

249.  Dr. Green told Dr. Doel-Hammond several times that women would come to him frequently to report sex discrimination at Alliance.  Dr. Green also made similar statements in front of other Alliance leadership.

250.  In response, Dr. Doel-Hammond urged Dr. Green that he had a duty to report allegations of discrimination.

251.  As an example of the biased treatment of women by Alliance, in approximately spring 2019, Dr. Keller expressed stress, and appeared overwhelmed with a particular project.  Dr. Doel-Hammond stated "I can help you with that; I am really good at that."  Dr. Keller replied by saying he needed to give Dr. Doel-Hammond feedback.

252.  Dr. Keller's feedback was that **Dr. Doel-Hammond should not say she is good at something; instead, she should remain silent, and let it be observed about her whether she was good at something or not**.

253.  Dr. Keller would not and did not give that type of feedback to a male, but rather, commended them for showing initiative and self-confidence.

254.  On previous occasions, Dr. Keller indicated that he highly valued self-confidence and the ability to speak-up in certain male employees.

255.  On information and belief, Dr. Keller made this comment to Dr. Doel-Hammond because of her sex and his perception of a woman's appropriate subordinate conduct.

256.  On information and belief, prior to Dr. Doel-Hammond's employment with Alliance, Dr. Keller participated in, or made the decision, to demote a female employee based on perceptions that she was too outspoken.

257.  Dr. Doel-Hammond observed several documents prepared by Alliance, that properly referred to male employees with doctorates as "Dr." while improperly referring to her (a female, with a doctorate) as "Ms." instead of "Dr."  On information and belief, Dr. Doel-Hammond was the only employee with a doctorate that Alliance referred to as "Ms."

258.  When the situation unfolded with Dr. Arca in Spring 2019, Dr. Doel-Hammond told Mr. Silbergleid ███████████████████████████████████████

████████

259.  Dr. Doel-Hammond noted ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ .

260. ███████████████████████████████████████████████

████████████████████████████████████████ .

***Alliance's Discrimination Against Dr. Doel-Hammond on the Basis of Her Sex and Her Being an Older Woman***

261.  At the time of her termination, Dr. Doel-Hammond was 57 years old.

262.  Around the end of 2019 or early 2020, Alliance hired Carin Casso Reinhardt to replace Dr. Doel-Hammond as CHRO.

263.  On information and belief, Ms. Reinhardt was approximately 44-years-old at the time Alliance hired her – approximately 13 years younger than Dr. Doel-Hammond.

264.  After Alliance terminated Dr. Doel-Hammond, Alliance did not utilize its Deputy CHRO, Jessica Pascual (age 56), to serve as the Acting CHRO.

265.  Instead, Alliance placed a female employee, in her early 40's, from the audit department, in the role of Acting CHRO.  On information and belief, this female employee had no experience in HR.

266.  One year to the day after Alliance terminated Dr. Doel-Hammond, on July 15, 2020, Alliance terminated Ms. Pascual, at which point she was 57-years-old.  On information and belief, Alliance cited Ms. Pascual's support to Dr. Doel-Hammond as a reason for Ms. Pascual's termination.

267.  Ms. Pascual previously served as Acting CHRO in Dr. Doel-Hammond's absence; including the two weeks prior to Dr. Doel-Hammond's termination.  On information and belief, Ms. Pascual met Alliance's expectations while serving as Acting CHRO.

268.  Dr. Keller previously made statements exhibiting bias in employment decisions, including, but not limited to:

a. Around the beginning of Dr. Doel-Hammond's employment, Dr. Keller spoke of Dr. Doel-Hammond's predecessor, Ms. Penny Burton.  On information and belief, Ms. Burton is approximately ten years older that Dr. Doel-Hammond, so approximately 67-years-old.  Dr. Keller stated that Ms. Burton was "old-fashioned" and that she did not know anything about "modern HR" practices.  Dr. Keller stated he was "so ready" for Ms. Burton to retire from Alliance, and made an "ick" sound.

b. In approximately late 2018, Dr. Keller spoke of Mr. Silbergleid, and stated "I believe in prayer.  When I am that old, God will tell me it is time to retire," as he folded his hands and looked up at the sky.  Then, Dr. Keller mimicked an older person walking with a cane.

c. In approximately spring 2019, Dr. Keller spoke to Dr. Doel-Hammond regarding succession planning related to Ms. Garrett.  In reference to Ms. Garrett, Dr. Keller stated "it is time for her to go.  She has old ideas and she is involved in everything.  I do not want you having any conversations with her about her staying longer."

269.  On information and belief, after Alliance terminated Dr. Doel-Hammond, it continued to unlawfully terminate older employees to be replaced by younger employees.

**<u>FIRST CLAIM FOR RELIEF</u>**
(Sex and Sex-Plus-Age Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and Sex and Age Discrimination in Violation of Colorado's Anti-Discrimination Act, C.R.S. § 24-34-402)

270.  Plaintiff incorporates allegations in paragraphs 1 – 269 of this Complaint and Jury Demand into this Claim for Relief.

271.  As a woman, over the age of 40, Plaintiff is a member of classes of persons protected
      from unlawful sex, age, and sex-plus-age discrimination by federal and state civil rights
      laws.

272.  At all material times, Plaintiff was qualified for her position with Defendant.

273.  At all material times, Plaintiff performed her position satisfactorily.

274.  As described in this Complaint, Defendant subjected Plaintiff to less-favorable terms and
      conditions of employment because of her sex, including but not limited to, subjecting
      Plaintiff to disproportionate scrutiny, holding Plaintiff to higher standards than her male
      peers, ostracizing and refusing to look at or communicate with Plaintiff, subjecting Plaintiff
      to undeserved discipline, subjecting Plaintiff to more severe discipline than her similarly
      situated male peers, and terminating Plaintiff's employment.

275.  Defendant also investigated and terminated Plaintiff because Defendant viewed older
      workers, primarily older females more unfavorably than younger females and/or older
      males.

276.  The effect of Defendant's practices deprived Plaintiff of equal employment opportunities
      and otherwise adversely affected her employment status because of her sex and/or age.

277.  Defendant terminated Plaintiff because of her sex and/or sex-plus-age.

278.  Defendant's alleged reason for terminating Plaintiff is pretext for discriminatory intent.

279.  Defendant's unlawful employment practices were intentional.

280.  Defendant engaged in the unlawful employment practices described above with malice or
      with reckless indifference to Plaintiff's protected civil rights.

281.  On information and belief, Dr. Keller participated in the decision to terminate Plaintiff by making the determination that Plaintiff would be terminated and/or by providing recommendations and information to those who made such decision.

282.  On information and belief, Dr. Keller's actions were motivated by discriminatory animus against Plaintiff.

283.  On information and belief, Dr. Keller intended that his actions cause and result in the termination of Plaintiff.

284.  Dr. Keller's actions were a proximate and but for cause of Plaintiff's termination.

285.  Defendant's unlawful acts toward Plaintiff have caused and continue to cause Plaintiff economic and non-economic damages and injuries, including pain and suffering, inconvenience, emotional distress, humiliation, embarrassment, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, and other losses.

## SECOND CLAIM FOR RELIEF
(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and Colorado's Anti-Discrimination Act, C.R.S. § 24-34-402)

286.  Plaintiff incorporates allegations in paragraphs 1 – 269 of this Complaint and Jury Demand into this Claim for Relief.

287.  Plaintiff engaged in protected activity on numerous occasions during her employment by, *inter alia*, a) frequently advising Defendant it was out of compliance with EEO rules and regulations; b) repeatedly telling Dr. Keller that she opposed his handling of reported discrimination as unlawful and in violation of his duties and obligations; c) reporting and addressing the inadequacies in Defendant's EEO compliance and its failure to abide by anti-discrimination laws; and d) opposing the discriminatory and retaliatory eviction of Dr.

Elisabetta Arca, including participating in an investigation to determine Defendant's liability regarding its treatment of Dr. Arca.

288.  In doing so, Plaintiff opposed discrimination on the basis of, *inter alia,* sex, disability, race, and national origin, as well as retaliation against Defendant's employees and applicants for making good faith complaints of practices made unlawful by Title VII and CADA.

289.  In doing so, Plaintiff also participated in an internal investigation of violations of Title VII and/or CADA as a fact witness, reporting that she believed that Defendant had engaged in unlawful discrimination and retaliation, which was outside the scope of her responsibilities as CHRO.

290.  Defendant knew that Plaintiff had engaged in protected activity as described above.

291.  Plaintiff had a reasonable, good faith belief that the matters she reported, took actions to oppose and advise Defendant to comply with were, or if not corrected, would be, unlawful.

292.  Beginning after Plaintiff began reporting, *inter alia*, violations of federal and state civil rights laws in approximately February 2019, Defendant began retaliating against her, subjecting Plaintiff to disproportionate scrutiny, holding Plaintiff to higher standards than her peers who had not reported discrimination or retaliation, ostracizing and refusing to speak to or look at Plaintiff, subjecting Plaintiff to undeserved discipline, disciplining her more harshly than her similarly situated male peers, and terminating her employment.

293.  Defendant's termination of Plaintiff was because of her protected activity from approximately February 2019 through June 2019.

294.  A reasonable employee would find termination of employment to be a materially adverse employment action.

295.  The effect of Defendant's practices deprived Plaintiff of equal employment opportunities and otherwise adversely affected her employment status because of her complaints of discrimination and retaliation.

296.  Defendant's unlawful employment practices were intentional.

297.  Defendant engaged in the unlawful employment practices with malice or with reckless indifference to Plaintiff's civil rights protected by federal and state law.

298.  Defendant's alleged reason for terminating Plaintiff is pretext for discriminatory intent.

299.  On information and belief, Dr. Keller participated in the decision to terminate Plaintiff by making the determination that Plaintiff would be terminated and/or by providing recommendations and information to those who made such decision.

300.  On information and belief, Dr. Keller's actions were motivated by retaliatory animus against Plaintiff.

301.  On information and belief, Dr. Keller intended that his actions cause and result in the termination of Plaintiff.

302.  Dr. Keller's actions were a proximate and but for cause of Plaintiff's termination.

303.  Defendant's unlawful acts toward Plaintiff have caused and continue to cause Plaintiff economic and noneconomic damages and injuries, including pain and suffering, inconvenience, emotional distress, humiliation, embarrassment, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, and other losses.

**THIRD CLAIM FOR RELIEF**

(Age Discrimination in Violation of the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), 29 U.S.C. § 623)

304.  Plaintiff incorporates allegations in paragraphs 1 – 269 of this Complaint and Jury Demand into this Claim for Relief.

305.  As a woman who was 57-years-old at the time of her termination, Plaintiff is a member of a class of persons protected from unlawful age discrimination by federal and state civil rights laws.

306.  At all material times, Plaintiff was well qualified for her position, and had satisfactorily performed her job duties, proven herself over many months, and Defendant was aware of Plaintiff's qualifications and performance.

307.  Defendant terminated Plaintiff and replaced her with a younger, less qualified employee.

308.  On July 15, 2019, Defendant terminated Plaintiff.

309.  Defendant terminated Plaintiff because of her age.

310.  Defendant's conduct was willful and/or was committed with reckless disregard for Plaintiff's protected rights.

311.  Defendant's unlawful acts toward Plaintiff have caused and continue to cause Plaintiff economic and non-economic damages and injuries, including pain and suffering, inconvenience, emotional distress, humiliation, embarrassment, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, and other losses.

**FOURTH CLAIM FOR RELIEF**

(Breach of Implied Contract)

312.  Plaintiff incorporates allegations in paragraphs 1 – 269 of this Complaint and Jury Demand into this Claim for Relief.

313.  Defendant had Laboratory-level Procedures and Policies, including Laboratory-level Procedures PROC 500-13 and 500-14, which were in effect at the time Plaintiff was discharged by Defendant.

314.  The Laboratory-level Procedures and Policies set forth the procedures and policies regarding the investigation, discipline, and discharge of Defendant's employees, such as Plaintiff.

315.  Defendant demonstrated to such employees a willingness to be bound by such Laboratory-level Procedures and Policies.

316.  Plaintiff was aware of the existence of the Laboratory-level Procedures and Policies before she was terminated by Defendant.

317.  Plaintiff reasonably understood that Defendant was offering the Laboratory-level Procedures and Policies, as part of the terms and conditions of her employment, and, with that understanding, Plaintiff continued her employment with Defendant.

318.  Defendant terminated Plaintiff without complying with its own investigation and termination procedures, as set forth in its Laboratory-level Procedures and Policies.

319.  Plaintiff performed her part of the implied contract until the point at which Defendant terminated her.

320.  Defendant's failure to follow its own Laboratory-level Procedures and Policies breached Plaintiff's implied employment contract.

321.  As a result of Defendant's breach of the implied contract, Plaintiff suffered general damages and special damages in the form of lost retirement income, moving costs, and other injuries that were the consequence of the termination of her employment.

322.  Defendant's breach of its implied contract with Plaintiff has caused and continues to cause Plaintiff damages and injuries, including past and future economic losses, including loss of earnings and loss of earning capacity, and other losses.

## FIFTH CLAIM FOR RELIEF
(Promissory Estoppel – Plead in Alternative to Implied Contract)

323.  Plaintiff incorporates allegations in paragraphs 1 – 269 of this Complaint and Jury Demand into this Claim for Relief.

324.  Through its Laboratory-level Procedures and Policies, Defendant made promises to Plaintiff that her employment would begin and continue with the protections provided, and that she would not be investigated or terminated absent adherence to those procedures and policies.

325.  Defendant created an environment that reinforced the adherence to all such Laboratory-level Procedures and Policies.

326.  Defendant reasonably expected, or reasonably should have expected, that the promises created in Laboratory-level Procedures and Policies would induce Plaintiff to begin and continue her employment with Defendant.

327.  Plaintiff reasonably believed that Defendant would conduct itself as promised in the Laboratory-level Procedures and Policies.

328.  Defendant's promises did, in fact, induce Plaintiff's action in choosing to continue her employment with Defendant.

329.  Defendant allegedly terminated Plaintiff for failing to follow Laboratory-level Procedures or Policies, while Defendant itself, failed to follow the same in terminating Plaintiff.

330.  Justice requires enforcement of Defendant's promise to Plaintiff that it would adhere to its own Laboratory-level Procedures and Policies.

331.   Defendant's breach of its promises caused and continues to cause Plaintiff damages and injuries, including past and future economic losses, including loss of earnings and loss of earning capacity, and other losses.

## SIXTH CLAIM FOR RELIEF
(Wrongful Discharge in Violation of Public Policy)

332.  Plaintiff incorporates allegations in paragraphs 1 – 269 of this Complaint and Jury Demand into this Claim for Relief.

333.  Defendant employed Plaintiff its Chief Human Resources Officer.

334.  Defendant terminated Plaintiff's employment in retaliation for her exercise of a job related right, and duty as a citizen, to report improper conduct by Defendant and by DOE, a federal agency.

335.  Defendant's termination of Plaintiff undermined, and is contrary to, the clearly expressed public policy in, *inter alia*, 48 C.F.R. § 3.101–1; the Federal Acquisition Regulations (FAR); the federal contract between Defendant and the U.S. Department of Energy; and the Colorado State Constitution Article II, Section 10.

336.  The public policy expressed in 48 C.F.R. §  3.101–1 impacts the public.

337.  The public policy expressed in the Colorado State Constitution Article II, Section 10, impacts the public.

338.  The public policy expressed in FAR impacts the public.

339.  The government-imposed requirements of Defendant's M&O Contract with the DOE impacts the public.

340.  48 C.F.R. § 3.101–1 states that "Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the

expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships. While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions."

341.   Plaintiff blew-the-whistle on the DOE's improper occupancy of NREL space, with Defendant's knowledge and lack of action, and reported that such an arrangement resulted in preferential treatment for both Defendant and the DOE and created a conflict of interest between Defendant and the DOE.

342.   FAR 1.102 is titled "Statement of guiding principles for the Federal Acquisition System," and states in pertinent parts that "[t]he Federal Acquisition System will … Conduct business with integrity, fairness, and openness," and promote competition. *See id.* at 1.102(b)(1) & (3).

343.   Plaintiff blew-the-whistle on the DOE's improper occupancy of NREL space, with Defendant's knowledge and lack of action, and reported that such an arrangement undercut fairness and openness in Defendant's contract with the DOE.

344.   Plaintiff blew-the-whistle on the DOE's improper occupancy of NREL space, which she believed and reported was a violation of the contract between Defendant and the DOE, as well as gross mismanagement of a Federal contract; an abuse of authority relating to a Federal contract; a substantial and specific danger to public health or safety; and a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract).

345.  The Colorado State Constitution Article II, Section 10, states in pertinent part that "every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty," evidencing a strong public policy in favor of freedom of speech, especially in relation to matters that impact the public, such as improper conduct by governmental agencies and contractors.

346.  Plaintiff exercised her right to be free to speak by blowing-the-whistle on the DOE's improper occupancy of NREL's office space (which Defendant knew of and refused to take action on), and by reporting her concern that this arrangement improperly permitted the DOE, a government agency, to financially benefit.  In other words, Plaintiff reported what she believed to be a gross overreach and abuse of power by the DOE, the contracting party for Defendant's M&O Contract, based on her knowledge that the DOE had commandeered the office space and was financially benefitting.

347.  Defendant was aware of Plaintiff's reports regarding the DOE staff's improper occupancy of NREL office space, and refusal to stop pushing that issue.

348.  As a direct and proximate result of Defendant's wrongful termination of Plaintiff's employment in violation of public policy, Plaintiff has and continues to suffer significant economic and non-economic injuries.

## SEVENTH CLAIM FOR RELIEF - RESERVED
(Retaliation in Violation of the National Defense Authorization Act of 2013, 41 U.S.C. § 4712)

349.  Plaintiff incorporates allegations in paragraphs 1 – 269 of this Complaint and Jury Demand into this Claim for Relief.

350.  On May 11, 2020, Plaintiff filed a Whistleblower Reprisal Complaint with the Department of Energy Office of Inspector General.

351.  As of the date of the filing of this Complaint and Jury Demand, the Office of Inspector

General's ("OIG") investigation remains ongoing, and could continue through

approximately June 12, 2021.

352.  Consequently, Plaintiff reserves the right to move for a stay of this case pending receipt

of the OIG's determination of the outcome of its investigation, or alternatively, to amend

this Complaint and Jury Demand upon receipt of the OIG's determination.

353.  By filing this Complaint and Jury Demand, Plaintiff in no way waives the right to assert

claims that require exhaustion of the DOE OIG's administrative process.

354.  Defendant is a government contractor.

355.  Plaintiff was an employee of Defendant, a government contractor, throughout the entirety

of her employment with Defendant.

356.  From approximately April to June 2019, Plaintiff reported her concerns with the DOE's

improper occupancy of NREL office space, including that such arrangement constituted

gross mismanagement or abuse of authority relating to the Prime Contract, a substantial

and specific danger to Defendant's employees' and the public's health or safety, and unfair

competition for government contracts.

357.  Plaintiff made these reports to officers of Defendant, as well as to a board member, all of

whom had responsibilities to investigate, discover, or address misconduct.

358. Ms. Garrett warned Plaintiff that the last person to try to shine light on this issue was

terminated.

359.  Plaintiff's reporting of these issues to Mr. Barwell, Ms. Garrett, Dr. Keller, █████

█████████ and Mr. Conger was a contributing factor in the investigation of her and the

eventual termination of her employment.

360. Defendant, including Mr. Barwell, Ms. Garrett, Dr. Keller, ███████, and Mr. Conger, had notice of Plaintiff's protected reporting.

361. The investigation of Plaintiff, that eventually purportedly led to the termination of her employment, was initiated just days after Plaintiff made her protected reports to Ms. Garrett and Dr. Keller.

362. Plaintiff was terminated only weeks after her report to Mr. Conger, and within a couple months of her initial reports.

363. Defendant's unlawful acts toward Plaintiff have caused and continue to cause Plaintiff economic and non-economic damages and injuries, including pain and suffering, inconvenience, emotional distress, humiliation, embarrassment, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, and other losses.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests:

1. That this Court assume jurisdiction;

2. That this Court enter judgment in Plaintiff's favor and against Defendant;

3. That this Court declare the actions of Defendant described in this Complaint and Jury Demand to be in Violation of Title VII of the Civil Rights Act of 1964;

4. That this Court declare the actions of Defendant described in this Complaint and Jury Demand to be in Violation of the Colorado Anti-Discrimination Act;

5. That this Court declare that Defendant's termination of Plaintiff's employment was contrary to public policy;

6. That the Laboratory-level Procedures constitute an implied contract between Defendant and Plaintiff, which Defendant breached by failing to comply with the provisions governing investigation, discipline, and termination;

7. That, alternatively, the Laboratory-level Procedures constitute promises by Defendant that must be enforced in equity as a result of Plaintiff's reasonable detrimental reliance; That Defendant engaged in retaliation in violation of the NDAA when Plaintiff's protected reports regarding the DOE staff's improper occupancy of NREL office space were a contributing factor in her termination;

8. That this Court award Plaintiff all appropriate relief at law and equity, including but not limited to backpay with pre-judgment interest, a gross-up adjustment for taxes and any subrogation interests, and all other make-whole relief, including all available consequential/compensatory/liquidated damages;

9. That this Court grant compensatory and consequential damages against Defendant, including but not limited to damages for emotional distress, humiliation, embarrassment, loss of income and enjoyment of life, and other pain and suffering on all claims by law in the amount to be determined at trial against the Defendant, as allowed by law;

10. That this Court order reinstatement of Plaintiff to her position with the same seniority and privileges, or, in lieu of reinstatement, reasonable frontpay to make her whole;

11. That this Court award general and special damages to Plaintiff;

12. That this Court enforce the promises made by Defendant, on which Plaintiff reasonably relied, and award damages for Defendant's breach of such promises;

13. That this Court grant exemplary and/or punitive damages as allowed by law;

14. That this Court award Plaintiff her attorney fees and costs of this action, including expert witness fees, on all claims allowed by law;

15. That this Court award pre-judgment and post-judgment interest at the highest lawful rate; and

16. That this Court award such additional or alternative relief as may be just, proper, and equitable.

## JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.


Respectfully submitted this 21st day of December, 2020.


*/s/ Clayton E. Wire*
Clayton E. Wire, #41717
Emily R. Fiscus, #49089
OGBORN MIHM, LLP
1700 Lincoln Street, Suite 2700
Denver, Colorado 80203
Phone: 303-592-5900
Fax:    303-592-5910
Clayton.wire@omtrial.com
Emily.fiscus@omtrial.com
*Attorneys for Plaintiff*


Plaintiff's Mailing Address:
652 State Highway 165
#311
Placitas, NM 87043-0311